**In re MAXWELL COMMUNICATION CORPORATION PLC, et al.,**
Debtors.

**MAXWELL COMMUNICATION CORPORATION PLC, By Andrew Mark HOMAN, Colin Graham Bird, Jonathon Guy Anthony Phillips, and Alan Rae Dalziel Jamieson, its Joint Administrators, Plaintiffs/Appellants,**

v.

**SOCIETE GENERAL PLC,**
Defendant/Appellee.

**MAXWELL COMMUNICATION CORPORATION PLC, By Andrew Mark HOMAN, Colin Graham Bird, Jonathon Guy Anthony Phillips, and Alan Rae Dalziel Jamieson, its Joint Administrators; Plaintiff/Appellant,**

and

**Richard A. Gitlin, Examiner, Intervenor Plaintiff/Appellant,**

v.

**BARCLAYS BANK PLC,**
Defendant/Appellee.

**MAXWELL COMMUNICATION CORPORATION PLC, By Andrew Mark HOMAN, Colin Graham Bird, Jonathon Guy Anthony Phillips, and Alan Rae Dalziel Jamieson, its Joint Administrators; Richard A. Gitlin, Examiner, Plaintiffs/Appellants,**

v.

**NATIONAL WESTMINSTER BANK PLC, Defendant/Appellee.**

Nos. 91 B 15741 (TLB), 94 Civ. 8411 (SAS), 94 Civ. 8412 (SAS) and 94 Civ. 8413 (SAS).

United States District Court,
S.D. New York.

Sept. 12, 1995.

John G. Gellene, Milbank, Tweed, Hadley & McCloy, New York City, for plaintiffs Maxwell Communication Corp.

Evan D. Flaschen, G. Eric Brunstad, Jr., Ronald J. Silverman, Hebb & Gitlin, Hartford, CT, for plaintiff Richard A. Gitlin.

John W. Dickey, James H. Carter, Tamar Feder, Sullivan & Cromwell, New York City, Karen E. Wagner, Henry L. King, James P. Rouhandeh, Davis Polk & Wardwell, New York City, for defendant National Westminster Bank plc.

Thomas C. Rice, Dennis C. O'Donnell, Steven Fuhrman, Simpson, Thacher & Bartlett, New York City, for defendant Barclays Bank plc.

Jeffrey Barist, Jennifer L. Sheppard, White & Case, New York City, for defendant/appellee Societe Generale.

## OPINION

SCHEINDLIN, District Judge:

Debtor Maxwell Communication Corporation plc ("MCC" or the "Debtor") and Examiner Richard A. Gitlin (the "Examiner") appeal from final judgments of the bankruptcy court for the Southern District of New York, Tina L. Brozman, J., dismissing Adversary Complaints filed by MCC and the Examiner against defendants/appellees Barclays Bank plc ("Barclays"), National Westminster Bank plc ("NatWest"), and Societe General ("SocGen").[1] The three Complaints sought to avoid and recover certain transfers made by MCC to Defendants within 90 days prior to the commencement of MCC's Chapter 11 case and to disallow claims filed by the Defendants against the Debtor's bankrupt estate.

The bankruptcy court dismissed the Complaints pursuant to Fed.R.Civ.P. 12(b)(6), holding that the general presumption against extraterritoriality and considerations of comity prevented utilization of § 547 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., to avoid the pre-petition transfers. On appeal, MCC and the Examiner contend that the transfers were not extraterritorial in nature, and that, even if they were, Congress clearly intended that § 547 apply extraterritorially. MCC and the Examiner also argue that considerations of comity did not require the bankruptcy court to dismiss the Complaints. For the reasons set forth below, I disagree with appellants and affirm the judgment of the bankruptcy court.

## I. Background

The facts underlying the Complaints are fully set forth in the bankruptcy court's decision and need not be repeated here except for a brief summary.[2] MCC is an English company that, prior to its Chapter 11 case, functioned primarily as a holding company for a variety of publishing and information service businesses located throughout the world. Approximately 80% of MCC's total asset pool and its largest sources of revenue consisted of its ownership of two American entities, MacMillan, Inc. ("MacMillan") and Official Airlines Guide, Inc. ("OAG"). How-

1. The Examiner was not a party to the Adversary proceeding against SocGen and therefore only appeals from the Orders dismissing the Complaints against Barclays and NatWest.

2. The parties agree on almost all of the relevant facts for purposes of the appeals. The undisputed facts are set forth in the allegations of the Adversary Complaints and in affidavits and annexed exhibits submitted for the Court's consideration by agreement of the parties. *See In re Maxwell Communication Corp. plc,* 170 B.R. 800, 801 n. 3 (Bankr.S.D.N.Y.1994). These materials are part of the Record filed on January 25, 1995.

ever, MCC incurred most of its debt in England.

Barclays and NatWest are English Companies which maintain their principal offices in London, although both banks have branch offices in the United States. SocGen is a French banking institution headquartered in Paris, France with branch offices in London and New York. All three defendants are in the business of providing banking and financial services throughout the world and provided MCC with credit facilities to service its working capital needs. These credit facilities, which were administered and drawn upon by MCC in London prior to its bankruptcy filings, helped MCC finance its purchases of Macmillan and OAG in 1988.

## A. The Bankruptcy Filings

The unique aspect and the most important feature of this case for purposes of these appeals is MCC's parallel bankruptcy filings in the courts of two nations. On December 16, 1991, MCC filed a Chapter 11 petition in the Southern District of New York. On December 17, 1991, MCC presented a petition to the High Court of Justice in London for an administration order under the Insolvency Act 1986. Because the dual filings commenced plenary insolvency proceedings in the U.S. and England, the U.S. bankruptcy court appointed an Examiner whose "mandate was to harmonize the two proceedings so as to permit a reorganization under U.S. law which would maximize the return to creditors." *In re Maxwell*, 170 B.R. at 802. The High Court appointed four Joint Administrators in the English proceeding to function as the corporate governance of MCC and to administer its affairs.

The Joint Administrators and the Examiner subsequently entered into a procedural "Protocol" in order to coordinate their efforts. The Protocol enumerates the respective powers and duties of the Joint Administrators and the Examiner and provides the basis for the "Plan of Reorganization" ("Plan") filed in U.S. bankruptcy court and "Scheme of Arrangement" ("Scheme") filed in the High Court in England. The Plan and Scheme, which set forth the debtor's post-reorganization obligations to its creditors,

are mutually interdependent documents that "constitute a single mechanism, consistent with the laws of both countries, for reorganizing MCC." *In re Maxwell*, 170 B.R. at 802. The documents create a single pool of assets and permit creditors to file claims in either jurisdiction which suffice for participation under both the Plan and Scheme. However, the choice of law and forum issues which are the subject of this appeal were explicitly not decided in these documents: MCC's Disclosure Statement—submitted in connection with creditor voting on the Plan and Scheme—expressly recognized that the appropriate forum for a given claim is to be decided on a "case-by-case" basis. *See* Disclosure Statement at p. 133. In addition, § 6.04 of the Plan states that the Joint Administrators shall consult with the Examiner on "whether or in which court to assert a particular claim" and on "choice of law" matters, while the Scheme states that the word "court" in both the Plan and Scheme means "the English Court or the U.S. Court, as is the more appropriate forum in the particular case." Plan of Reorganization at § 6.04; Scheme of Arrangement at Annexure 1 (Definitions).

## B. The Transfers

Before it filed for bankruptcy protection, MCC sold significant portions of its U.S. assets in an attempt to reduce some of the debt it had incurred in acquiring Macmillan and OAG. Specifically, Macmillan sold its "Directories" division for $145 million and Computer Book Publishing, a subsidiary, for $157.5 million. As detailed in the bankruptcy court's opinion, portions of the sale proceeds were used to repay MCC's overdraft balances on its accounts with the Banks in London. These transfers, which occurred within 90 days of MCC's bankruptcy filings, consisted of transfers of over $30 million dollars and over 2 million pounds to Barclays, over 71.5 million pounds to NatWest, and over 5.7 million pounds to SocGen. *See In re Maxwell*, 170 B.R. at 803–4, 806–7.

SocGen is the only defendant to dispute that it received loan payments from the sale proceeds of MCC's U.S. assets. Unlike the Adversary Complaints filed against Bar-

clays and NatWest, the SocGen Complaint does not contain any allegations that the transfer to SocGen derived from the sale of MCC's U.S. assets. However, MCC argues that the Court should assume for purposes of the instant motion that the transfers came from U.S. assets because the transfer to SocGen occurred on the same day that Macmillan sold its "Directories" division. This evidence, while not overwhelming, is sufficient in the context of a motion to dismiss to raise a reasonable inference that the transfer to SocGen originated from U.S. asset sales. *See Paulemon v. Tobin,* 30 F.3d 307, 308 (2d Cir.1994) (a court must construe all reasonable inferences in a light most favorable to the plaintiff on a motion to dismiss). Accordingly, I assume for purposes of these appeals that the transfers to SocGen derived from U.S. asset sales.

### C. *The Complaints And The Bankruptcy Court's Decision*

After the Banks filed notices of claim in England, MCC filed Adversary Complaints, pursuant to 11 U.S.C. §§ 547 and 550, to recover the transfers made to the Banks and to disallow their claims pursuant to 11 U.S.C. § 502(d). Section 547(b) provides in pertinent part:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the filing of the petition ... [and]

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Banks then moved, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the complaints for failure to state a claim upon which relief could be granted.[3] The Banks alleged that the transfers were extraterritorial in nature, and that the presumption against the extraterritorial application of federal statutes as well as considerations of comity precluded the use of § 547 to avoid the transfers. The Banks also argued that an English court applying English law should adjudicate the preference claims, a contention obviously motivated by the differences between U.S. and English preference law. In order for a transfer to be avoidable as a preference under English law, the debtor must subjectively intend to put the transferee into a better position than the transferee would have otherwise enjoyed as a creditor. *See In re Maxwell,* 170 B.R. at 808 and n. 12. This requirement is absent under § 547 of the Bankruptcy Code, which focuses only on the effect of a transfer—namely, whether the transfer "enables a creditor to receive payment of a greater percentage of his claim against the debtor then he would have received if the transfer had not been made and he had participated in the distribution of assets of the bankrupt estate." *Union Bank v. Wolas,* 502 U.S. 151, 160–61, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991) (quoting

---

**3.** Before the Joint Administrators and Examiner filed the Adversary Complaints, Barclays sought injunctive relief in England to prevent the Joint Administrators from commencing a preference suit in U.S. bankruptcy court under U.S. law. Although Barclays initially obtained an *ex parte* injunction, the English Court subsequently vacated the restraint and held that Judge Brozman was the proper person to decide whether to accept jurisdiction of a suit seeking to recover the transfer to Barclays. *See Barclays Bank plc v. Holman,* [1992] BCC 757 (July 28, 1992). The English judge also stated:

It is therefore sufficient for me to say that, having regard to the connecting factor provided by the source of the repayment money [MCC's sale of U.S. assets], a decision by the U.S. court to assert jurisdiction under § 547 would not in my judgment involve, according to English notions, so egregious a claim of extraterritoriality that justice requires that it should be prevented by injunction.

*Id.*

H.R.Rep. No. 95–595, pp. 177–78), 95th Cong.2d Sess. pp. 177–78 (1978) U.S.Code Cong. & Admin.News 1978 pp. 5787, 5963, 6138.

The bankruptcy court dismissed the Complaints. *See In re Maxwell*, 170 B.R. at 800. The court first held that the transfers were extraterritorial in nature because "the debtor is an English corporation, the antecedent debts were incurred overseas, the transfers on account of those debts were made overseas, and the recipients, although subject to ... [the bankruptcy court's personal jurisdiction] are nonetheless all foreigners." *Id.* at 809. In addition, the court held that the fact that the transfers were derived from U.S. asset sales was insufficient to characterize the transfers as domestic events. *Id.* The court then found that the presumption against extraterritoriality could not be overcome where neither the language nor legislative history of § 547 or the bankruptcy code as a whole evinced Congress' intent to apply § 547 to conduct occurring outside the borders of the U.S. *Id.* at 811–12. The Court summarized its holding as follows:

> What I do hold is that where a foreign debtor makes a preferential transfer to a foreign transferee and the center of gravity of that transfer is overseas, the presumption against extraterritoriality prevents utilization of § 547 to avoid the transfer.

*Id.* at 814. Finally, the court held in the alternative that considerations of comity precluded the use of § 547 to avoid the transfers. The instant appeals followed.

## II. Discussion

■ This Court has appellate jurisdiction over the three appeals pursuant to 28 U.S.C. § 158(a). The bankruptcy court's decision to dismiss the complaints for failure to state a claim is reviewed *de novo*. *See Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 593 (2d Cir.1993). When considering a Rule 12(b)(6) motion, a Court must presume all material factual allegations in the complaint to be true and must construe all reasonable inferences in a light most favorable to the plaintiff. *See Paulemon*, 30 F.3d at 308. The complaint may be dismissed only if "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 309 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). However, the bankruptcy court's alternative holding that considerations of comity mandated dismissal of the complaints is reviewed under an abuse of discretion standard. *See Allstate Life Ins. Co. v. Linter Group, Ltd.*, 994 F.2d 996, 999 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). With these principles in mind, I turn to MCC's and the Examiner's arguments on appeal.

### A. The Presumption Against Extraterritoriality

■ MCC and the Examiner contend that the bankruptcy court erred in holding that the presumption against extraterritoriality precluded the use of § 547 to avoid the transfers to the Banks. The presumption is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Equal Employment Opportunity Comm. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) ("*Aramco*") (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577–78, 93 L.Ed. 680 (1949)). The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248, 111 S.Ct. at 1230 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963)). Moreover, the presumption recognizes that Congress is primarily concerned with domestic conditions when it legislates. *Aramco*, 499 U.S. at 248, 111 S.Ct. at 1230–31 (citing *Foley Bros., Inc.*, 336 U.S. at 285, 69 S.Ct. at 577–78).

■ A two-fold inquiry is required when attempting to apply the presumption in a specific factual setting. *See Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 70–75 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995). First, a

court must determine if the presumption applies at all: after identifying the conduct proscribed or regulated by the particular legislation in question, a court must consider if that conduct occurred outside of the borders of the U.S. *See id.* at 70–72; *Gushi Bros. Co. v. Bank of Guam,* 28 F.3d 1535, 1538–39 (9th Cir.1994); *Environmental Defense Fund v. Massey,* 986 F.2d 528, 531 (D.C.Cir. 1993). Second, if the presumption is implicated, an inquiry into Congressional intent must be undertaken to determine if Congress intended to extend the coverage of the relevant statute to such extraterritorial conduct. *Kollias,* 29 F.3d at 72; *Gushi Bros. Co.,* 28 F.3d at 1542–43.

### 1. *Are the transfers extraterritorial?*

■ MCC and the Examiner contend that the transfers do not call for the extraterritorial application of U.S. law for two reasons. First, MCC and the Examiner argue that, because the money received by the Banks was derived from the sale of U.S. assets, the transfers have a substantial connection to the United States. Second, MCC and the Examiner contend that because the Banks seek a ratable share of MCC's assets—the bulk of which consist of sale proceeds generated in the United States—the Banks have acquiesced in MCC's Chapter 11 case and have subjected themselves to the equitable claims adjustment process of the bankruptcy code, of which § 547 is an integral part. *See* Transcript of Oral Argument, April 17, 1995 ("Tr.") at p. 25. To appellants, the Banks' participation in the claims adjustment process has "obvious, strong connections with the United States," and should be considered the relevant conduct for purposes of an extraterritoriality analysis under § 547. MCC Reply Brief at p. 4.

■ The specific conduct proscribed by § 547 is the actual payments made to the Banks. Section 101(54) of the bankruptcy code defines "transfer" as:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property ...

Because MCC actually parted with the transferred funds in England, it is possible to view the transfers as occurring wholly outside the borders of the U.S. However, such a limited conception of "transfer" for purposes of an extraterritoriality analysis would have potentially dangerous implications for the future application of § 547: a creditor—be it foreign or domestic—who wished to characterize a transfer as extraterritorial could simply arrange to have the transfer made overseas, a result made all too easy in the age of the multinational company and information superhighway. *See* MCC Reply Brief at p. 3 ("If accepted as a means of removing the U.S. connections from a transaction, the Banks' use of overseas wire transfers would provide a roadmap for future attempts by creditors to evade United States Law."). The fact that funds were electronically transferred to accounts in England is not, standing alone, sufficient to characterize the events as extraterritorial.[4]

■ A more appropriate analysis of the relevant conduct under § 547 is to consider all component events of the transfers. For example, in *Gushi Bros. Co.,* 28 F.3d at 1538–39, the court found that the relevant conduct supporting the plaintiff's claim under the Bank Holding Company Act, 12 U.S.C. § 1971 et seq., was a loan made by a U.S. bank to a foreign borrower on the condition that the borrower close its account with another bank. In deciding that this conduct was extraterritorial, the court noted that the preliminary discussions leading to the loan agreement, as well as the actual execution of the agreement, took place outside of the U.S. *Id.; see also Massey,* 986 F.2d at 532–33

---

4. Natwest's citation of *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) is inapposite. In *Barnhill,* the Supreme Court held that a § 547 transfer that is made by check occurs on the date that the check is honored by the drawee bank. *Id.* The *Barnhill* court reasoned that the date of honor should control because it is at that moment that a creditor obtains control of transferred funds. *Id.* While *Barnhill*

clarifies when a transfer occurs, it does not address the issue of *where* a transfer takes place—or what conduct is relevant—for purposes of an extraterritoriality analysis. Simply because the transfers occurred or were completed on the date that the Banks obtained control of the transferred funds is not dispositive of whether those transactions should be deemed to have occurred outside of the U.S.

(concluding that the relevant conduct relating to the application of the National Environmental Policy Act occurred within the U.S. because that statute was intended to govern the decision-making process of federal agencies). Thus, the court considers the location of the transfers as well as the component events of those transactions as relevant to the first prong of an extraterritoriality analysis.

■ Viewing the transfers in this manner clearly indicates that the transfers occurred overseas. First, MCC and the Banks are all foreign entities whose relationship was centered in England. Indeed, the antecedent debts underlying the transfers arose from MCC's overdrafts on accounts maintained with the Banks in England and governed by English law. MCC repaid these debts by transferring the funds to these accounts in the U.K.[5] The only possible U.S. connections are that the transferred funds did consist of proceeds from the sale of U.S. assets and that the sales did deplete the U.S. assets available to satisfy the claims of all creditors against MCC. However, the source of the funds is at best only one component of the conduct proscribed by § 547. Even assuming that the transfers were initiated in the U.S. after the U.S. assets were sold, this conduct is more appropriately characterized as a preparatory step to the transfers. See Gushi Bros., 28 F.3d at 1538 ("[C]onduct occurring within the United States which, standing alone, is merely preparatory or incidental to the proscribed conduct does not confer ... jurisdiction."). While relevant to an extraterritoriality analysis, the fact that the transferred funds derived from U.S. asset sales is insufficient—in light of the absence of any other domestic connection—to characterize the transfers as occurring within the borders of the U.S.

■ Nor can the relevant conduct be considered the Banks' "participation" in the Chapter 11 claims adjustment process. The Supreme Court has held that a creditor participates in the claims allowance process and subjects itself to the equity jurisdiction of the bankruptcy court when it files a proof of claim. See Langenkamp v. Culp, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990) (citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 58–59, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989)). It is true that the Banks have lodged Notices of Claim in England and seek a ratable share of MCC's distributable assets. It is also true that these assets, the bulk of which consist of the proceeds of sale of OAG and Macmillan, are for the most part held in the United States and that the Banks would thus obtain payments from the sale of U.S assets. It is not true, however, that the Banks have submitted to the equitable jurisdiction of the U.S. bankruptcy court. The Banks have not filed proofs of claim in the U.S. proceeding, and MCC and the Examiner cite no precedent for the proposition that the Banks' participation in the U.K. proceeding should be considered equivalent to the filing of a claim in the U.S. Courts have narrowly interpreted what conduct, other than filing a claim, is sufficient to subject the creditor to the equity jurisdiction of the bankruptcy court. See, e.g., In re Stansbury Poplar Place, Inc., 13 F.3d 122, 126 (4th Cir.1993) (holding that a listing as a creditor is insufficient to constitute a claim and does not subject the creditor to the court's equitable power); In re Beeline Eng'g & Constr., Inc., 139 B.R. 1023, 1024 (Bankr. S.D.Fla.1992) (creditor's objection to debtor's request for an extension of time in which to file a reorganization plan was not a submission to court's equity jurisdiction).

■ Moreover, the Plan and Scheme do not, as appellants contend, subject the Banks to the Chapter 11 claims adjustment process. While the Plan and Scheme constitute an integrated program for the filing and allowance of claims against MCC, those documents do not provide that filing a claim in one country subjects the creditor to the jurisdiction and laws of the other. For example, sections 6.06 and 6.07 of the Plan merely

5. As detailed by the bankruptcy court, MCC's initial transfer to Barclays was made from an MCC Natwest account in London to Barclays' branch in New York, through which all payments made to Barclays in dollars are routed. However, the funds were then immediately credited to the outstanding balance on MCC's London overdraft account with Barclays. See In re Maxwell, 170 B.R. at 804.

provide that the Joint Administrators may file Notices of Claim in the U.S. bankruptcy court and may amend MCC's schedules filed in the bankruptcy court to reflect claims filed in the U.K. This facilitates the coordination of both insolvency proceedings, but does not mean that a U.K. creditor has filed a claim in the U.S. and agreed to have its claims adjusted under U.S. law.[6] Similarly, the sections in the Plan and Scheme which do refer to preference claims allow the Joint Administrators and Examiner to decide whether to assert a preference claim and to consult with each other on the "appropriate" forum for any such claim. See Plan of Reorganization at § 6.04; Scheme of Arrangement at Annexure 1 (Definitions). MCC and the Examiner appear to forget that there are *two* ongoing plenary insolvency proceedings in this case and that, while the Plan and Scheme attempt to harmonize the cases, those documents do not purport—and could not—govern the choice of law issues that are at the crux of this case. Rather, the "appropriate" forum must be based on precepts of statutory construction and basic choice of law principles implemented by either the U.S. or English court.

Accordingly, the Banks have not participated as creditors in the U.S. proceeding and have not submitted to the claims adjustment process of the Bankruptcy Code, of which § 547 is an integral part. The relevant conduct for purposes of an extraterritoriality analysis is the transfers which, as discussed above, are clearly foreign transactions. Thus, the presumption against extraterritoriality, in the absence of explicit Congressional direction to the contrary, prevents the use of that section to avoid the transfers as preferential.

2. *Did Congress intend § 547 to govern extraterritorial transfers?*

■ An act of Congress will not be found to apply to conduct occurring outside the U.S. unless " 'the affirmative intention of the Congress' " to apply the law extraterritorially is " 'clearly expressed' " in the statute. *Aramco*, 499 U.S. at 248, 111 S.Ct. at 1230 (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)). If the legislative purpose is not "unmistakably clear," see *Labor Union of Pico Korea v. Pico Products*, 968 F.2d 191, 195 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992), any ambiguity in the statute must be resolved in favor of refusing to apply the law to events occurring outside U.S. territory. See *Aramco*, 499 U.S. at 253, 111 S.Ct. at 1233 ("If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.").

■ In *Kollias*, 29 F.3d at 73, the Second Circuit rejected a reading of *Aramco* that would require a "clear statement" that the relevant statute could be applied to conduct occurring outside the U.S. Instead, the *Kollias* court held that a court may consider the specific language of a statute *and* other indicia of Congressional intent—including legislative history and administrative interpretations—to determine if the presumption against extraterritoriality has been overcome. See also *Subafilms. Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088, 1096 (9th Cir.) (en banc) (court considered Copyright Law and other enactments to determine if Copyright laws applied to conduct outside of the U.S.), *remanded*, 31 F.3d 812 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). Accordingly, an inquiry into whether Congress intended that § 547 apply extraterritorially should include the language and legislative

---

**6.** The Banks have also pointed to Plan § 6.09, which provides that

[n]o act taken by the Joint Administrators pursuant to §§ 6.06 or 6.07 [of the Plan] shall in and of itself be deemed a submission to the jurisdiction of the U.S. court by any creditor with respect to whose claim the Administrators may be acting.

It is unclear if this section only refers to personal jurisdiction over a creditor, or whether it refers

to submission to the bankruptcy court's equitable jurisdiction, or whether it refers to both. As each of these interpretations of the clause are reasonable, on a motion to dismiss I assume that "jurisdiction" refers to personal jurisdiction and that § 6.09 does not necessarily support the Banks's argument that they have not submitted to the Chapter 11 claims adjustment process by filing claims in England.

history of both § 547 and the entire bankruptcy code as well as any other evidence which may shed light on Congress' intent.

■■■ MCC and the Examiner argue that Congress clearly intended that § 547 apply to conduct occurring outside of the U.S and point to the plain language of § 547, the "comprehensive" nature of the code as a whole, a number of specific code provisions, and general bankruptcy policies which allegedly evince this intent. These arguments, while not without merit, do not meet MCC's or the Examiner's heavy burden of demonstrating that Congress unmistakably intended that § 547 apply extraterritorially.

■■■ First, nothing in the language or legislative history of § 547 expresses Congress' intent to apply the statute to foreign transfers. MCC argues that the term "any transfer" in § 547(b) should be literally read to encompass any transfer, wherever consummated; however, broad, boilerplate language such as the term "any transfer" is insufficient to overcome the presumption against extraterritoriality. *See Aramco*, 499 U.S. at 251, 111 S.Ct. at 1232 (broad jurisdictional language of Title VII, including expansive definitions of "employer" and "commerce," insufficient to rebut presumption); *Amlon Metals, Inc. v. FMC Corp.*, 775 F.Supp. 668, 675 (S.D.N.Y.1991) (use of "any person" did not establish statute's extraterritorial applicability).[7] MCC and the Examiner have not pointed to any legislative history of § 547 or the bankruptcy code as a whole that would alter this conclusion.

■■ The "comprehensive" nature of the Code also does not serve to overcome the presumption against extraterritoriality. MCC and the Examiner contend that the Bankruptcy Code envisions three specific approaches to administering the assets of a foreign debtor. First, a foreign debtor may file for full Chapter 11 relief if it has property in the U.S. *See* 11 U.S.C. § 109(a). In addition, a foreign bankruptcy has two other alternatives: 11 U.S.C. § 304 authorizes a foreign debtor to seek "ancillary relief" in aid of a "foreign proceeding," including the enjoining of litigation in the U.S. against the debtor, and 11 U.S.C. § 305 authorizes the bankruptcy court to suspend or dismiss a foreign debtor's case under certain circumstances. Unlike a full Chapter 11 case, these latter two alternatives do not give a foreign debtor the right to commence an avoidance action. MCC and the Examiner contend that these three alternatives constitute a comprehensive legislative scheme for dealing with foreign debtors holding property in the U.S., and if a debtor chooses to commence a full Chapter 11 case, it is entitled to all of the rights—including the power to bring an avoidance action—that any debtor possesses.

■■ This argument is flawed. While § 109 provides that a foreign debtor is entitled to full bankruptcy relief, that provision does not specify that U.S. law is applicable to all of the foreign debtor's transactions. Moreover, simply because a foreign debtor may not bring an avoidance action in an ancillary proceeding under §§ 304 or 305 does not imply that the debtor has an unlimited ability to bring an avoidance claim in a plenary case under § 109. Finally, neither § 109 nor §§ 304 and 305 contemplate the situation involved in the present case in which there are *plenary* bankruptcy cases pending in the courts of two nations.

■■■ MCC and the Examiner also rely on § 541(a) of the Code which provides that:

> [the] estate is comprised of all of the following property, wherever located and by whomever held:
>
> ... (3) Any interest in property that the trustee recovers under section ... 550 ... of this title.
>
> (7) Any interest in property that the estate acquires after the commencement of the case.

---

7. MCC's citation of 11 U.S.C. § 508(a) is also unavailing. Section 508(a) limits the ability of a creditor who receives a payment or "transfer" of property in a foreign proceeding from receiving a distribution in a Chapter 11 case. Because "transfer" in § 508(a) obviously refers to offshore transfers of property, MCC and the Examiner contend that "transfer" in § 547 should be interpreted to have the same meaning in order to give the term a consistent definition in the Code. However, § 508(a) specifically refers to a "foreign" proceeding, and is therefore illustrative of Congress' ability to express an intent to legislate with respect to conduct that occurs abroad.

11 U.S.C. § 541(a)(3), (7). Property that can be recovered under § 550 includes property whose transfer is avoided by the exercise of § 547. As the *in rem* jurisdiction of the court extends to property "wherever located and by whomever held" and that may be recovered as a preferential transfer, MCC and the Examiner contend that § 541 indicates that Congress intended § 547 to govern foreign transfers. However, § 541 by its terms only applies to property which is property of the estate. Because preferential transfers do not become property of the estate until recovered, *see In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir.1992), § 541 does not indicate the Congress intended § 547 to govern extraterritorial transfers.

■■■ Finally, the Code's twin policies of discouraging dismemberment of financially distressed debtors and promoting equality of distribution among similarly situated creditors will not be undermined by a finding that the presumption against extraterritoriality has not been overcome. If § 547 does not apply to the transfers at issue, MCC and the Examiner contend that U.S. creditors will suffer in two respects: domestic creditors will still be subject to disgorgement of preferential transfers while foreign creditors like the Banks will not, and U.S. creditors will be deprived of their ratable share of the preferential payments received by the Banks. However, this argument assumes that all pre-insolvency transfers are avoidable, which is not the case; § 547(c) contains a number of exceptions to the power of a trustee to recover payments made by the debtor within 90 days of a bankruptcy filing.[8] In addition, the Code requires equal treatment of *similarly situated* creditors. English creditors who dealt with an English debtor in England are not similarly situated with U.S. creditors who dealt with the debtor in the U.S., especially where there are simultaneous insolvency proceedings pending in the two countries.

■■■ Of course, if the Adversary Complaints are dismissed, MCC may be unable to recover the transfers to the Banks, who will in all probability receive further distributions from MCC's remaining pool of assets. MCC and the Examiner correctly point out that while there may be two plenary insolvency proceedings—of which the Banks have only officially participated in one—there is only *one* group of assets available for distribution to MCC's creditors. As the bankruptcy court noted, however, English preference policy is not that different than that of the U.S., and application of English law would thus not be so unfair as to require the use of U.S. law. *See In re Maxwell*, 170 B.R. at 818 ("This forum's policy interests in retaining jurisdiction over these suits are not very compelling when viewed in their totality because the ultimate purpose of our preference laws, recoupment and equal distribution, exists under the Insolvency Act 1986 as well."); *cf. Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807 (S.D.N.Y.1992) (holding that the procedures under the U.K. Insolvency Act are comparable to the procedures under the Bankruptcy Code). MCC may still seek recovery of the preferences under English law; in this vein, I note that augmentation of the estate is not a policy objective of the Code, and choice of law determinations cannot be made on the basis of which law will provide the most benefit to the estate. In any event, any unfairness to MCC's remaining creditors does not suffice to demonstrate Congress' intent that § 547 apply to extraterritorial transfers.

In sum, the appellants have failed to meet their burden of demonstrating that Congress intended that § 547 apply to foreign transfers. The Supreme Court has stated that "[w]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440, 109 S.Ct. 683, 691, 102 L.Ed.2d 818 (1989). Because Congress has not "clearly expressed" its desire that § 547 govern extraterritorial conduct, *see Aramco*, 499 U.S. at 248, 111 S.Ct. at 1230–31, that section

---

8. For example, a trustee may not avoid a transfer which qualifies as a preference under § 547(b) if the transfer is made in payment of a debt incurred in the ordinary course of business of the debtor and the transferee, the transfer is made in the ordinary course of business of the debtor and the transferee, and the transfer is made according to ordinary business terms. *See* 11 U.S.C. § 547(c)(2).

cannot apply to the foreign transfers at issue in this case.

### 3. *The Domestic "Effects" Of The Transfers*

MCC and the Examiner also argue that the effects of the transfers in the United States make the presumption against extraterritoriality inapplicable. In *Massey*, 986 F.2d at 531, the court in dicta enumerated three distinct categories of cases in which the presumption does not apply: where the regulated conduct occurs within the U.S., where Congress clearly intended to extend the scope of a statute to conduct occurring within foreign nations, and where "the failure to extend the scope of the statute to a foreign setting will result in adverse effects in the United States." In support of this proposition, the *Massey* court noted that the Sherman Anti–Trust Act, Lanham Trade–Mark Act and the securities laws have been applied extraterritorially where "the failure to extend the statute's reach would have negative economic consequences within the United States." *Id.* at 531 (citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (Lanham Act); *U.S. v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) (Sherman Act); and *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.1968) (securities laws)); *see also Restatement (Third) of the Foreign Relations Law of the United States,* § 402(1)(c) (1987) (a state has jurisdiction to prescribe law with respect to "conduct outside its territory that has or is intended to have substantial effect within its territory").[9]

Barclays argues that the "effects" test is inapposite because a court should not apply the test unless it first determines that Congress intended to apply the relevant statute extraterritorially. This contention is not without merit. In the cases cited by *Massey*, "the ultimate touchstone of extraterritoriality consisted of an ascertainment of congressional intent; courts did not rest *solely* on the consequences [within the U.S.] of a failure to give a statutory scheme extraterritorial ap-

plication." *Subafilms. Ltd.,* 24 F.3d at 1096 and n. 13 (emphasis in the original). For example, in *Aluminum Co. of Am.,* 148 F.2d at 443, Judge Learned Hand, in considering the effects of the defendant's conduct within the U.S., stated, "we are concerned only with whether Congress chose to attach liability to conduct outside the United States of persons not in allegiance to it." It is therefore unclear if the domestic "effects" of foreign conduct, in the absence of Congressional direction that a statute be applied to such conduct, is sufficient to render the presumption inapplicable and create a valid cause of action under the relevant statute.

■ In any event, it is unnecessary to reach the Congressional intent issue because the domestic effects of the transfers at issue here are insufficient to overcome the presumption. The "effects" within the U.S. of the transfers to the Banks are the reduction of MCC's U.S. assets and the injuries to U.S. creditors or citizens. As to creditors, any impact is lessened where parallel insolvency proceedings exist in both the U.S. and U.K. and where all of MCC's assets are pooled for the benefit of all creditors, most of whom are English. *See Laker Airways,* 731 F.2d at 923 ("Jurisdiction exists only when significant effects were intended within the prescribing territory."). Given that most creditors are English and that it would have been difficult to foresee any significant domestic effects of the transfers, it is also difficult to imagine that the Banks intended the alleged preferences to result in substantial effects in the U.S. In addition, the U.S. assets were sold as going concerns, and the bankruptcy court found—and MCC and the Examiner have not disputed—that U.S. citizens, jobs, and communities were not put at risk by the sales. Thus, the "effects" within the U.S. are insufficient to render the presumption inapplicable. Accordingly, the bankruptcy court correctly dismissed the Adversary Complaints for failure to state a claim.

*See U.S. v. Aluminum Co. of America,* 148 F.2d at 443; *Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909, 923 (D.C.Cir.1984).

---

**9.** Most courts discussing the "effects" exception to the presumption against extraterritoriality have required that the actor intend that its conduct result in substantial effects within the U.S.

## B. *Comity*

■ The bankruptcy court also held that, even assuming that the presumption against extraterritoriality had been overcome, principles of international comity mandated dismissal of the Complaints. Comity is a canon of statutory construction providing that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *See Hartford Fire Ins. Co. v. California*, — U.S. —, —, 113 S.Ct. 2891, 2919, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting) (quoting *Murray v. The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.)). While not a matter of absolute obligation, on the one hand, or simply of mere courtesy and good will, on the other, comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

■ Because comity is based on the respect sovereign nations afford each other by limiting the reach of their laws,[10] courts have naturally looked to international choice of law principles in attempting to apply this canon of statutory construction. *See, e.g., Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382–83, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368 (1959); *Laker Airways*, 731 F.2d at 938 and n. 109. Indeed, comity is a traditional component of choice of law theory. *See Hartford Fire*, — U.S. at —, 113

S.Ct. at 2920 (citation omitted). The Second Circuit has adopted choice of law rules that require the application of the "law of the jurisdiction having the greatest interest in the litigation." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). "The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent." *Id.*[11]

■ The bankruptcy court clearly did not abuse its discretion in finding that traditional choice of law principles "point decidedly towards the application of U.K. law." *In re Maxwell*, 170 B.R. at 818. As discussed above, MCC was an English company that was managed from London. Its relationship with the Banks—two of which are English entities—was centered in England and governed by principles of U.K. law. The transfers occurred in England on account of debt incurred there. While MCC's most valuable assets were located in the U.S. and the proceeds from the sale of those assets constituted the bulk of the transferred funds, any U.S. related effects from these facts pales in comparison to the multitude of contacts with the U.K. As noted above, MCC's subsidiaries were sold as going concerns and the sales did not significantly impact U.S. jobs or communities. Moreover, as most of MCC's creditors are English, the effect on U.S. creditors of the transfers is outweighed by the effects of the transactions in England.

English bankruptcy law and policies are also implicated to a greater extent than com-

---

**10.** In *Hartford Fire*, Justice Scalia also identified a related, albeit different type of comity: whereby a court declines to exercise jurisdiction over a matter more appropriately decided elsewhere. *See id.*, — U.S. at —, 113 S.Ct. at 2920. In the context of transnational insolvencies, this type of comity is an appropriate and often invoked doctrine, *see Allstate Life Ins., Co. v. Linter Group Ltd.*, 994 F.2d at 999, especially where a U.S. court is confronted with an English bankruptcy proceeding. *See, e.g., Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. at 810 (dismissing on comity grounds U.S. action against debtor who was involved in English insolvency proceedings); *see also In re Axona*, 88 B.R. 597 (Bankr. S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.

1990), *appeal dismissed*, 924 F.2d 31 (2d Cir. 1991).

**11.** This analysis is basically the same as that set out in § 403 of the Restatement (Third) of Foreign Relations Law of the United States (1987) ("Restatement (Third)"). Under the Restatement (Third), the touchstone of a choice of law analysis is "reasonableness." The factors set out in the Restatement (Third) that a court may consider as part of a reasonableness inquiry are focused on locating the jurisdiction whose laws and policies are the most involved with the controversy. *See also Hartford Fire*, — U.S. at —, 113 S.Ct. at 2921 (Scalia, J., dissenting).

parable U.S. law and policies. Because there is an insolvency proceeding pending in England, that country's interest in applying its law to English transfers outweighs any U.S. interest, especially where the locus of relevant facts surrounding the transfers is the U.K. The parties' relationship was conducted in England, and the only reasonable and commercially practicable assumption would have been that their relationship—including a potential bankruptcy filing—would be governed by English law. This conclusion follows even though I find that a Chapter 11 proceeding could have been foreseen by the Banks, who are extremely sophisticated entities represented by the ablest of legal counsel. Nonetheless, the reasonable assumption would still have been that a U.K. transaction would be governed by U.K. law.

■ Moreover, the bankruptcy court and High Court in England have conducted MCC's insolvency proceedings in a spirit of cooperation, and deference to the English court would further previous efforts by both countries' courts to harmonize the proceedings. *See In re Maxwell*, 170 B.R. at 802 ("The Joint Administrators in England and the Examiner in New York, subject to the jurisdiction of both courts, have carried out the administration of MCC in unprecedented cooperation with each other."). The fact that English bankruptcy law and policies are not so dissimilar to U.S. bankruptcy law as to make the application of English law oppressive or unfair is further support for this conclusion. For these reasons, the bankruptcy court's holding that principles of comity mandated dismissal of the Adversary Complaints was clearly within its equitable discretion.

■ The appellants' remaining arguments as to the bankruptcy court's exercise of comity are without merit. MCC and the Examiner contend that a court may not invoke comity where Congress has demonstrated an intent to give a statute extraterritorial effect. Assuming that Congress has evinced this intent, however, does not bar a court's decision to apply principles of comity. Comity is "wholly independent" of the presumption against extraterritoriality and applies even if the presumption has been overcome or is otherwise inapplicable. *Hartford Fire,*

— U.S. at ——, 113 S.Ct. at 2919 (Scalia, J., dissenting). A court may conclude that, despite the fact that Congress intended to give a statute extraterritorial effect, Congress would not have intended to assert its power over the specific foreign conduct at issue and decline to apply U.S. law. For example, courts have refused to apply the Sherman Act—a statute with a clearly extraterritorial reach—on grounds of international comity. *See, e.g., Laker Airways,* 731 F.2d at 938; *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d at 1287, 1294–98 (3d Cir.1979). Indeed, it is especially appropriate to decline to apply a statute extraterritorially where, as in the present case, the assertion of jurisdiction would be "unreasonable" and against the dictates of international choice of law principles.

The Examiner also argues that a "true conflict" must exist between U.S. and English preference law before a court can decline to apply U.S. law on comity grounds. In *Hartford Fire,* — U.S. at ——, 113 S.Ct. at 2910, the Supreme Court held that a court may not invoke comity and decline to apply otherwise applicable U.S. antitrust law to foreign conduct unless a "true conflict" exists between the U.S. and foreign laws. However, the Supreme Court specifically declined to address "other considerations that might inform a decision to refrain from the exercise of jurisdiction on the grounds of international comity." *Id.* at ——, 113 S.Ct. at 2911. The Second Circuit has interpreted this latter statement to mean that *Hartford Fire* may not apply in contexts other than antitrust. *See Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 747 (2d Cir.1994) (holding that "true conflict" requirement of *Hartford Fire* does not necessarily apply to questions of trademark law).

■ The *Hartford Fire* approach seems particularly inappropriate in the context of the Bankruptcy Code. The Code does not impose a regulatory scheme that governs conduct in the same manner as the antitrust laws; rather, the Code is intended to redistribute assets in the event that insolvency proceedings are commenced. As the bankruptcy court aptly stated:

[O]ne cannot speak in terms of complying with both [U.S. and English preference] laws. Preferences are not proscribed under either country's law; indeed, there is

nothing inherently evil about preferences and a debtor is entitled to prefer creditors prior to bankruptcy, although, with the advent of bankruptcy, the preferences may be susceptible of avoidance.

*In re Maxwell,* 170 B.R. at 814 n. 19 (citations omitted). Thus, there is no basis for the requirement that a "true conflict" exist between U.S. and English preference laws. Accordingly, *Hartford Fire* does not bar the use of comity to dismiss the Adversary Complaints.

C. *11 U.S.C. § 502(d)*

■ MCC and the Examiner also seek to disallow the transfers to the Banks pursuant to 11 U.S.C. § 502(d) which provides, in relevant part, that:

> the court shall disallow any claim of any entity from which property is recoverable under section ... 550 ... or that is a transferee of a transfer avoidable under section ... 547 of this title ... unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section ... 550 ... of this title.

Appellants contend that, even if § 547 is not available to avoid the transfers, § 502(d) may still be invoked to disallow the claims filed by the Banks in the U.K.[12] In order for a transferee's claim to be disallowed under § 502(d), however, it must have received a "transfer avoidable" under § 547. Obviously, the Banks have not received a "transfer avoidable" under § 547 because that section does not apply to the payments to the Banks. In addition, § 502 only applies to the allowance and disallowance of claims filed under 11 U.S.C. § 501. *See Durham v. SMI Indus Corp.,* 882 F.2d 881, 883 (4th Cir.1989) ("Since a court can only disallow a claim after one has been filed under ... § 501(a) ...

"claim" in § 502(d) includes only one for which a proof has been filed."). As discussed above, the Banks have lodged a Notice of Claim in the English court but have not filed a Proof of Claim under § 501 and thereby submitted to the equitable jurisdiction of the U.S. court. Accordingly, there are no "claims" to disallow under § 502(d), and the appellants are therefore not entitled to the relief they seek.[13]

## III. CONCLUSION

The judgment of the bankruptcy court is affirmed. The Adversary Complaints are dismissed for failure to state a claim upon which relief can be granted.

SO ORDERED.

---

12. Barclays contends that the Examiner waived this argument by failing to raise it in the bankruptcy court. However, the Adversary Complaints all contain claims under § 502(d) and the bankruptcy court appeared to address the argument at the hearing on the Banks' motions to dismiss. *See* Transcript of Hearing, June 13, 1994 at p. 125. Even if the argument was not specifically raised and argued in the bankruptcy court, moreover, this court has the power to consider an issue presented by the record on appeal. *See In re Hilsen,* 119 B.R. 435, 439 (S.D.N.Y.1990) (citations omitted).

13. The Examiner cites several cases holding that, even if a preferential transfer cannot be avoided due to the expiration of the statute of limitations imposed by 11 U.S.C. § 546, the transfer may still be asserted under § 502(d) to disallow a claim filed against the estate. *See, e.g., In re KF Dairies, Inc.,* 143 B.R. 734, 737 (9th Cir. BAP 1992); *In re Octagon Roofing,* 156 B.R. 214, 219 (Bankr.N.D.Ill.1993). However, the cases cited by the Examiner all involve scenarios in which the transferee had asserted claims against the estate, which was not done here.