**In re INTERBULK, LTD., Debtor.**

**Interbulk, Ltd., Plaintiff,**

v.

**Louis Dreyfus Corp., Defendant.**

**Bankruptcy No. 97–44202 (TLB).
Adversary No. 98–8468A.**

United States Bankruptcy Court,
S.D. New York.

Oct. 22, 1999.

---

Haight, Gardner, Holland & Knight by Jon Y. Arnason, D. Farrington Yates, New York City, for Interbulk, Ltd.

Seward & Kissel by Bruce G. Paulsen, New York City, for Louis Dreyfus Corporation.

## DECISION DENYING MOTION BY LOUIS DREYFUS CORPORATION FOR SUMMARY JUDGMENT DECLARING NON–AVOIDABILITY OF CERTAIN PRE–PETITION TRANSFERS

TINA L. BROZMAN, Chief Judge.

## INTRODUCTION

The Bankruptcy Code (the "Code") provides a trustee [1] with many powers, among them the power under section 547(b) to avoid prepetition transfers if certain conditions are met. Not all facially qualifying transfers may be avoided, however, for section 546 provides limitations on the trustee's avoiding powers, one of which applies to transfers related to swap agreements.

Here, the debtor, Interbulk, Ltd. ("Interbulk") has brought an adversary proceeding to declare an attachment by Louis Dreyfus Corporation ("Dreyfus") a preference, to disallow a claim filed by Dreyfus, and to declare any further actions to enforce the attachment to be a violation of the automatic stay. Dreyfus seeks judgment summarily declaring the attachment unavoidable as a transfer under a swap agreement or a settlement payment under a forward contract embraced by the exceptions to avoidability contained in section 546. Additionally, Dreyfus asserts that the bankruptcy court lacks subject matter jurisdiction over the transactions that gave rise to the attachment because they are said to be extraterritorial in nature.

### I.

The following facts, which are not in dispute, are derived from the Joint Statement Pursuant to Local Bankruptcy Rule 7056–1 and its accompanying exhibits. Interbulk and Dreyfus entered into two contracts entitled U.S. GULF/JAPAN FORWARD FREIGHT AGREEMENTS (the "FFAs") on or about January 3 and January 22, 1997. The FFAs were, but for the price terms, identical agreements that essentially provided for a settlement payment to be made at the end of April 1997, based on the difference between the contract rate and the average rate of the Baltic Freight Index. When settlement was made, the direction of payment, that is, which party was to be paid, would depend on the rise or fall of the Index price. Clarkson Securities, an English company, negotiated the FFAs by telephone with Interbulk and Dreyfus. They were principal to principal contracts with settlement directly between the parties, to be governed and construed in accordance with English Law with any disputes to be decided by the English Courts, to whose exclusive jurisdiction the parties had submitted. At the end of April, 1997, in accordance with the FFAs, Dreyfus issued two invoices totaling $306,550.40 to Interbulk for the amounts due from Interbulk under the FFAs.

Cetragpa GIE [2] ("Cetragpa"), a French company, owed Interbulk a sum of money

---

1. As there has been no trustee appointed in this case, but, rather, the debtor continues in possession of the estate armed with the same powers as a trustee pursuant to sections 1106 and 1107 of the Code, "trustee" and "debtor" are used interchangeably.

2. Although CIE is a French abbreviation for "compagnie," i.e. "company," in English, all

greater than the $306,550.40 owed under the FFAs. So in mid-May, Dreyfus obtained an order of attachment in Paris, on the debt owed by Cetragpa to Interbulk (the "Attachment")[3] and then sought to enforce the Attachment in the English Courts. Just about five weeks later, Interbulk filed a Chapter 11 petition and subsequently commenced this adversary proceeding.

## II.

■ We begin with Dreyfus' assertion that this court lacks subject matter jurisdiction over the transactions that gave rise to the attachment because they are said to be extraterritorial in nature. Dreyfus, a U.S. Corporation, filed with this court a proof of claim for $306,550.40 which declares that it is a "protective proof of claim" and does not constitute Dreyfus' consent to the jurisdiction of the bankruptcy court over the assets that the French court attached. Dreyfus asserts that this protective language is sufficient to shield it from jurisdiction and that, in any event, the presumption against extraterritorial application of section 547 is determinative. Interbulk responds that Dreyfus mistakenly relies upon the presumption against extraterritorial application of section 547 and that Dreyfus' filing of a proof of claim has granted equitable jurisdiction to this court.

Dreyfus relies upon the series of decisions in *In re Maxwell Communication Corporation, plc* as the linchpin for its argument that there is a presumption against the extraterritorial application of United States preference laws. *See In re Maxwell Communication Corp.*, 170 B.R. 800 (Bankr.S.D.N.Y.1994), *aff'd* 186 B.R. 807 (S.D.N.Y.1995), *aff'd* 93 F.3d 1036 (2d Cir.1996). The application of the law would be extraterritorial, according to Dreyfus, because the process by which the FFAs were negotiated and entered into had its "center of gravity" outside of the United States. What Dreyfus fails to realize is that there are critical distinctions between the facts of *Maxwell* and those present here.

In *Maxwell*, there were parallel bankruptcy proceedings in England and the United States for the debtor, an English corporation. *See Maxwell*, 186 B.R. 807, 813 (S.D.N.Y.1995). The joint administrators appointed by the high court in London and the examiner appointed by this court entered into a procedural protocol (the "Protocol") to coordinate their efforts to administer the two cases as a single estate. *Id.* The Protocol provided for the creation of a single pool of assets in which creditors from both countries could share by filing claims in either jurisdiction. *Id.* Three foreign (to the United States) creditors (the "Creditors") had received transfers overseas from the debtor within 90 days of the debtor's bankruptcy filings. *Id.* All three filed claims in England, but not here. Cognizant that the administrators contemplated suit in the United States to recover the preferences from them, the Creditors sought unsuccessfully, in England, to enjoin the administrators from commencing suit under section 547 of the Code. The administrators then filed adversary complaints in this court to recover the transfers from the Creditors. *Id.* at 814. The Creditors promptly moved for dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief could be granted. *Id.* The Creditors argued that the transfers were extraterritorial in nature and considerations of comity prevented the use of section 547 to avoid them. *Id.* I concluded that section 547 was not meant by Congress to apply extraterritorially and that inasmuch as the center of

---

of the pleadings and submissions of the parties refer to Cetragpa GIE.

**3.** There was a motion to vacate the attachment in the French court made by Four Winds Trading, Limited, an affiliate of Inter-

bulk, that was voluntarily joined by Interbulk and subsequently denied by the French court. An appeal of the denial to vacate the attachment was also denied. (Ex. 1, Supp. Reply Aff. in Support).

gravity of these transfers was indeed extraterritorial, they could not be avoided. I alternatively concluded that principles of international comity dictated that the avoidance actions had to be dismissed. Whereas my decision was affirmed on both grounds in the district court, in the further appeal to the circuit court, only the alternative holding was reached and my decision was affirmed on that ground alone. The circuit court did not rule on the question of first impression—whether the U.S. preference laws are extraterritorial in their reach.

But even holding fast to my previously-expressed conclusion that our preference laws are not meant to be applied extraterritorially does not preordain the failure of Interbulk's adversary proceeding, for the application of the law which Interbulk here seeks is not extraterritorial.[4] Unlike any of the defendants in *Maxwell*, Dreyfus is a domestic corporation which negotiated the FFAs, through an intermediary, by telephone in New York. The Attachment was an effort to secure payment to Dreyfus through accounts in New York. In *Maxwell*, the only connection to the U.S. was that the monies were at one point routed through a bank account in New York, but the transfers were between foreign entities and made overseas. Moreover, Dreyfus has submitted itself to the equitable jurisdiction of this court through the filing of a proof of claim, again unlike in *Maxwell*. I cannot conclude that the application of our laws to this set of facts would be an extraterritorial one.

■ Dreyfus' final jurisdictional challenge is that I lack equitable jurisdiction to try its action without a jury. It is well settled that equitable jurisdiction extends not only to resolution of a proof of claim but to any avoidance action asserted by way of counterclaim. *See Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990); *S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 705 (2d Cir.1995); *Maxwell*, 186 B.R. at 817. Dreyfus nonetheless contends that the protective language contained in its proof of claim prevents this court from exercising that equitable jurisdiction over Dreyfus.

In *S.G. Phillips*, the Second Circuit noted certain factors upon which the Ninth Circuit in *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159 (9th Cir.1986), had relied to hold that a defensive filing of a proof of claim did not confer jurisdiction upon the bankruptcy court. The creditor:

> (1) moved for relief from the automatic stay, (2) moved to have the district court withdraw its reference of the claims to the bankruptcy court, (3) continually objected to the bankruptcy court's jurisdiction, and (4) did not file a proof of claim until after all other reasonable measures of had failed and the bankruptcy court had taken jurisdiction.

*S.G. Phillips*, 45 F.3d at 706–07. Whereas the creditors in *Castlerock* had acted throughout in a manner that was inconsistent with acceptance of the bankruptcy court's jurisdiction, the creditor in *S.G. Phillips* became deeply involved in the proceedings, waited ten months to move

---

4. Dreyfus also argues that principles of comity suggest that section 547 should not be applied extraterritorially. The two notions, international comity and "presumption against extraterritoriality," are separate; the latter requires a clear expression from Congress for a statute to reach non-domestic conduct. But even where a statute embraces non-domestic conduct, principles of comity may counsel against its application unless Congress has indicated otherwise. *See Maxwell*, 93 F.3d at 1047; *Romero v. International Terminal Oper. Co.*, 358 U.S. 354, 382–83, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Dreyfus' argument is meritless as there is no competing bankruptcy proceeding in a foreign country, nor are there any conflicting foreign preference laws involved. *See Hong Kong & Shanghai Bank. Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 999 (9th Cir.1998) (International comity is limited to cases in which there is "in fact a true conflict between domestic and foreign law.").

for relief from the automatic stay and never moved to have the reference withdrawn by the district court, prompting the Second Circuit to hold that the creditor had consented to the equitable resolution of its claims.[5] *Id.* at 707–08. Here, Dreyfus filed a proof of claim with protective language. Yet Dreyfus waited· until this adversary proceeding was commenced to object to the jurisdiction of this court. Dreyfus never moved for relief from the automatic stay and never moved to have the reference withdrawn by the district court. Dreyfus did not act in such a manner as to continually object to the jurisdiction of this court and has participated as a creditor in these proceedings.

### III.

Bankruptcy Rule 7056, which incorporates Fed.R.Civ.P. 56, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d 157, 160 (2d Cir.1999) (quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995)). The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion. *Id.* Therefore, Dreyfus has the burden of proving that no genuine issue of material fact exists warranting judgment in Dreyfus' favor as a matter of law.

Should Dreyfus meet that burden, Interbulk would have to show "significant probative supporting evidence" that a factual dispute exists or that the law is not as Dreyfus describes it. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because Dreyfus contends it was operating under a swap agreement, we begin our inquiry with section 546(g) of the Code, which provides that "... the trustee may not avoid a transfer under a swap agreement, made by or to a swap participant, in connection with a swap agreement and that is made before the commencement of the case...." 11 U.S.C. § 546(g). Thus, as a threshold matter, the FFAs must not only be swap agreements but the Attachment must be a transfer both "under" and "in connection with" a swap agreement.[6]

### A. The FFAs as Swap Agreements

A swap is defined as "an agreement (including terms and conditions incorporated by reference therein) which is·a rate swap agreement, ... forward rate agreement, commodity swap, ... [or] any other similar agreement." 11 U.S.C. § 101(53B). The definition provided by the Code does little to illuminate whether the FFAs are swap agreements because

---

**5.** The Second Circuit also expressly declined to decide whether it agreed with the Ninth Circuit that the "defensive" filing of a proof of claim did not confer equitable jurisdiction on the court. *S.G. Phillips,* 45 F.3d at 707.

**6.** It must be noted that section 546(g) requires that the transfer be made "by or to a swap participant" and "before the commencement of the case." "Swap participant" is defined in section 101(53C) to mean an entity that "at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). Clearly, if the FFAs are swap agreements, then both Interbulk and Dreyfus are "swap participants" within the meaning of the Code and Interbulk does not argue otherwise. Additionally, there is no dispute that the order granting the Attachment was entered before the commencement of the case.

the various types of swaps listed are not defined. However, to aid in determining whether the FFAs are swaps, Dreyfus has provided a definition, undisputed by Interbulk, that states:

> a swap is a bilateral agreement, frequently between a commercial entity involved with commodities or subject to interest rate, currency or equity price fluctuations and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon benchmark. J. Francis, W. Toy & J. Whittaker, *The Handbook of Equity Derivatives* p. 527 (1995).

Dreyfus observes that the FFAs have all the characteristics of swaps and therefore fit the definition provided. Interbulk contends that inasmuch as there was no financial intermediary involved in the FFA transactions, Dreyfus does not even meet its own definition of swap. Nonetheless, the lack of a financial intermediary is not a prohibition to the FFAs being swaps under Dreyfus' definition or others;[7] financial intermediaries are often, but not invariably, involved. Here, the FFAs essentially swap freight rates at a future date based on the changes of an index. Additionally, the settlement process of the FFAs is a lump sum payment at termination calculable from the changes of a specified index. Whereas Interbulk sug-

gests that this price is not a fixed one, I disagree inasmuch as it is readily calculable pursuant to a stated formula based on an identified index. Thus, the FFAs conform to the definition of swap agreements and are swap agreements within the meaning of the Code.

### B. The Attachment as a Transfer Within and Under Section 546(g)

■ Dreyfus having cleared the first hurdle, we turn to the second, whether the Attachment is a transfer "under" and "in connection with" a swap agreement,[8] and thus unavoidable under section 546(g).[9]

"Transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). With a definition as all-encompassing as this one, it is evident that Congress intended its sweep to be broad. *See In re Durso Supermarkets, Inc.*, 193 B.R. 682, 696 (Bankr.S.D.N.Y.1996) *citing In re Metro Water & Coffee Servs.*, 157 B.R. 742, 745 (Bankr.W.D.N.Y.1993) ("It is clear that in defining 'transfer' as it did in Section 101(54), Congress intended to make it as broad as possible."); *Vasquez v. Mora (In re Mora)*, 218 B.R. 71, 74 (9th Cir. BAP 1997) ("transfer includes any transfer of 'possession, custody or control.' "). Here, the Attachment was an involuntary

---

7. For example, "[a] swap is an agreement between two parties whereby the parties agree to exchange one or more future payments measured by different prices of a commodity, with payments calculated by reference to a notional amount." *Nuts and Bolts of Financial Products 1999: Understanding the Evolving World of Capital Market and Investment Management Products. Derivatives: A Selected Overview,* Yeres, David. 1099 PLI/Corp 315, 323 1999.

8. Dreyfus also argues that the payment by attachment qualifies as a "settlement payment" under a forward contract, an argument plainly without merit. Pursuant to section 101(51A) of the Code, a settlement payment

includes the usual types of voluntary payment, be they interim, partial, on account, preliminary, final or net, as well as "any other similar payment commonly used in the forward contract trade[.]" An attachment of a debt due from a third party does not square with this definition.

9. As the two remaining conditions required for section 546(g) to apply, namely "by or to a swap participant" and "before the commencement of the case" are not disputed, the only remaining considerations are whether the Attachment was both "under" and "in connection with" a swap agreement. *See supra,* note 4.

parting with an interest in and control of property of Interbulk. *See* 11 U.S.C. § 101(54); *Vasquez*, 218 B.R. at 74. Thus, under the broad definition provided by the Code, the Attachment constitutes a transfer.

We move on to whether an attachment of a debt due the debtor in payment of a debt due from the debtor under a swap agreement constitutes a "transfer under a swap agreement, made by or to a swap participant, in connection with a swap agreement and that is made before the commencement of the case." 11 U.S.C. § 546(g).

█ If a statute is clear and unambiguous on its face, it should be enforced according to the terms outlined. *Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). In other words, the plain meaning of a statute should be followed unless it will produce an absurd result or a result at odds with the intent of Congress. *In re Episode USA, Inc.*, 202 B.R. 691, 695 (Bankr. S.D.N.Y.1996) *citing U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290, (1989) ("[t]he plain meaning of legislation should be conclu-

sive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.' ").

Section 546(g) is clear and unambiguous.[10] The phrases "under," "by or to a swap participant," "in connection with" and "before the commencement of the case" are conjunctive phrases, so each element must be met for a transfer to be unavoidable as a swap. The phrases "by or to a swap participant" and "before the commencement of the case" pose little in the way of interpretive difficulty. A natural reading of "under" would suggest that a transfer will be under a swap agreement when it is accomplished according to the method prescribed in the agreement itself. A natural reading of "in connection with" suggests a broader meaning similar to "related to."

Here, at best, the Attachment is a transfer "in connection with" a swap agreement. Without meeting every element of section 546(g), the Attachment cannot be considered as an exception to a preference action. Simply put, the Attachment cannot be viewed as a transfer both "under" and "in connection with" a swap agreement, as

---

**10.** It appears that Congress was fearful of a trustee being able to " 'cherrypick' the swaps—continuing the transactions favorable to the bankrupt institution and terminating unfavorable ones" and enacted section 546(g) to prevent such a result. 135 Cong.Rec. E1291 1989. Congress was also fearful that such power on the trustee's part could allow one bankruptcy to undermine the basic function of the swaps market as a whole. *Id.* Thus, the legislative history of section 546(g) suggests that the correct reading may be to require a transfer to be "under" *or* "in connection with" a swap agreement. *See* S.Rep. No. 101–285, 101st Cong. 2nd Sess. (1990) U.S.Code Cong. & Admin. News 1990 at pp. 223 ("This exception to the preference and other avoidance provisions recognizes that payments made and setoffs effected under or in connection with the agreement ...."). However, to hold that a transfer need only be "under" or "in connection" with a swap agreement would require a wholesale revision of the section. One cannot simply replace "and" with "or" and have the statute make

any sense, so I am not prepared to hold that this was a mere drafting error easily corrected.

Recently, Congress has attempted to rewrite the section to incorporate a change that the legislative history suggests may have been the original intent. *See, e.g.,* H.R.Rep. No. 126, 106th Cong. 1st Sess.1999 ("(A) by striking 'under a swap agreement'; (B) by striking 'in connection with a swap agreement' and inserting 'under or in connection with any swap agreement' "); S.Rep. No. 49, 106th Cong., 1st Sess.1999 ("transfers made under or in connection with a master netting agreement or an individual contract covered thereby may not be avoided by a trustee except where such transfer is made with actual intent to hinder, delay or defraud or except to the extent a transfer under an individual contract is otherwise avoidable."). Thus, the revised section 546(g), if enacted, would read "a transfer by or to a swap participant, under or in connection with a swap agreement and that is made before the commencement of the case...."

a result of which the attachment is not exempt from avoidance as a preference.

*CONCLUSION*

Although the defendant has shown that there are no material issues of fact, as a matter of law the defendant is not entitled to a determination that the attachment which occurred within ninety days of the filing of the Chapter 11 petition is exempt from attack as a preference under section 547 of the Code. Moreover, Dreyfus has submitted itself to the equitable jurisdiction of this court. Summary judgment is DENIED. SETTLE ORDER consistent with this decision.