**In re ENRON CORP., et al., Reorganized Debtors.**

**Enron Corp., Plaintiff,**

**v.**

**Credit Suisse First Boston International, et al., Defendants.**

**Bankruptcy No. 01 B 16034(AJG). Adversary No. 03–93371 A.**

United States Bankruptcy Court, S.D. New York.

July 29, 2005.

Venable LLP, by Michael Schatzow, Richard L. Wasserman, Michael B. MacWilliams, Darek Bushnaq, Regina Lee, Wallace Christner, Mitchell Kolkin, Michael Willinghan, Baltimore, MD, Special Counsel for Debtors.

Togut, Segal & Segal LLP, by Frank A. Oswald, Howard P. Magaliff, New York City, Co–Counsel for Reorganized Debtors.

Squire, Sanders & Dempsey LLP, by Jeffrey A. Marks, Cincinnati, OH, for Official Committee of Unsecured Creditors.

Cravath, Swaine & Moore LLP, by Richard W. Clary, Andrew B. Kratenstein, New York City, for Credit Suisse First Boston LLC.

Cleary, Gottlieb, Steen & Hamilton, by Jeffrey A. Rosenthal, New York City, for Lehman Commercial Paper, Inc., and Lehman Brothers International Europe.

62

Sullivan & Cromwell LLP, by Robinson B. Lacy, New York City, for UBS AG and UBS Securities, LLC.

Paul, Weiss, Rifkind, Wharton & Garrison, LLP, by Claudia R. Tobler, New York City, for Citibank NA and Affiliates Banco Nacional de Mexico.

Kramer Levin Naftalis & Frankel LLP, by Stephen M. Sinaiko, Jonathan A. Popolow, New York City, for Bear, Stearns International Limited and Bear, Stearns Securities Corp., Piper Jaffray, the AXA Defendants, and the Fleet Defendants.

## OPINION DENYING DEFENDANTS' MOTION TO DISMISS COMPLAINT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The matter before the Court is a motion to dismiss a complaint filed by a debtor in which the debtor asserts that certain transfers made by it are avoidable, pursuant to section 547 of the Bankruptcy Code, as preferential transfers and that certain of the payments are avoidable, pursuant to sections 544(b) and 548 of the Bankruptcy Code, as fraudulent conveyances.

The issue presented is whether, apart from the causes of action based upon intentional fraud, the avoidance causes of action should be dismissed because the payments at issue qualify, as a matter of law, as settlement payments that are protected from avoidance by sections 546(e) and 546(g) of the Bankruptcy Code. In addition, with respect to the causes of action that are based upon intentional fraud, the issue is whether the causes of action are asserted with sufficient particularity to defeat a motion to dismiss.

The Court concludes that, assuming the debtor was insolvent, certain of the transactions at issue that involved the payment by an Oregon corporation for the purchase of its own shares in violation of an Oregon statute, which prohibits distributions by an insolvent corporation on account of its stock, were not settlement payments within the context of, or protected from avoidance by, section 546(e) of the Bankruptcy Code. This is because, under Oregon law, an act in violation of the relevant Oregon distribution statute is considered void. Therefore, such action is a nullity and, as such, the underlying transaction cannot form the basis of a securities transaction that supports a settlement payment. As there was no resulting settlement payment, the protection afforded by section 546(e) of the Bankruptcy Code was not implicated. Nor does section 546(g) of the Bankruptcy Code protect such transfers from avoidance because if the underlying transaction involving the corporation's own shares were void, the transfer would not have been made under or in connection with a swap agreement.

With respect to certain of the transfers that were components of swap agreements and that did not involve a payment by the debtors in exchange for the debtors common stock, evidence must be presented on whether such agreements were similar to the types of swap agreements that were protected by section 546(g) from avoidance at the times of the relevant transactions.

The Court further concludes that the claims based upon intentional fraud are pled with sufficient particularity to defeat the motion to dismiss.

## FACTS

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corporation ("Enron") and certain of its affiliated entities, (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

Prior to filing for bankruptcy protection, starting in May 2000, Enron entered into a series of transactions with Credit Suisse First Boston LLC, f/k/a Credit Suisse Boston Corporation, and its wholly-owned subsidiary, Credit Suisse First Boston International (collectively, "Credit Suisse") related to Enron common stock. Pursuant to the terms of the confirmations (the "Confirmations") that reflect these transactions, the transactions incorporated certain definitions and documents published by the International Swaps and Derivatives Association, Inc. (the "ISDA"), including the ISDA 1992 Master Agreement.

At or before the date that Enron entered into each of the transactions, Credit Suisse purchased Enron common stock in the amount designated for the transactions. Certain of the transactions required that, at a specified future date (the "Termination Date"), Enron purchase a certain number of Enron common stock from Credit Suisse at a specified price. Certain other of the transactions required that one of the parties to the transaction make a comparable cash payment reflecting a change in the market price of the stock. Certain of the Confirmations included a provision wherein Credit Suisse agreed that, in the event of a bankruptcy filing by Enron, Credit Suisse would "not have rights or assert a claim that is senior in priority to the rights and claims available to the shareholders of the common stock of [Enron]." Thereafter, the parties entered into several additional agreements in which they adjusted the various Termination Dates and certain other terms of the transactions.

From June 6, 2001 to October 18, 2001, Enron and Credit Suisse entered into ten agreements (the "2001 Agreements") with Termination Dates ranging from November 12, 2001 to August 21, 2002. In March 2001, the price of Enron common stock began to decrease rapidly and in November 2001, Credit Suisse refused to allow for any further extensions of Enron's payment obligations. The Debtors assert that Enron was insolvent and confronted with a liquidity crisis but, nevertheless, in November 2001, Enron transferred $62,750,517.38 to Credit Suisse in exchange for 750,000 shares of Enron common stock and an additional $138,904,070.17 to Credit Suisse in exchange for 1,761,200 shares of Enron common stock. Also, in November, Enron transferred $11,806,478.64 to Credit Suisse (the November transfers are collectively referred to as the "90–Day Transfers"). The $11,806,478.64 payment was not made in exchange for stock.

In addition to the 90–Day Transfers, in the one-year period preceding the filing of the bankruptcy petition—specifically on August 17, 2001—Enron made several transfers to Credit Suisse totaling $17,286,693.40. Thus, the total transfers for the one-year period prior to the filing of the bankruptcy petition and including the 90–Day Transfers was $230,747,759.59.

The Debtors allege that Enron was insolvent but nevertheless paid in excess of $200,000,000.00 to Credit Suisse, either to purchase Enron common stock or in transactions otherwise related to Enron common stock. Enron further alleges that Credit Suisse, either directly or through an affiliate, was a significant lender and financial advisor to Enron.

On November 25, 2003, Enron commenced this adversary proceeding seeking to recover the payments it made to Credit Suisse. In the Complaint, Enron seeks

avoidance and recovery, pursuant to §§ 547 and 550 of the Bankruptcy Code, of the 90–Day Transfers as preferential transfers. Enron also seeks entry of a judgment declaring that, under applicable Oregon law, the 2001 transfers and 2001 Agreements were illegal and void distributions to Enron common stockholders. As void transactions, Enron seeks rescission of the 2001 Agreements and the payments made and restitution from Credit Suisse for any amounts by which Credit Suisse was unjustly enriched. In addition, pursuant to §§ 544(b), 548 and 550 of the Bankruptcy Code and applicable state law, Enron seeks avoidance and recovery of the 90–Day Transfers and their respective 2001 agreements as fraudulent conveyances. In the Complaint, Enron also seeks disallowance, pursuant to § 502(d) of the Bankruptcy Code, of any claims filed by Credit Suisse until payment by Credit Suisse of any amounts for which it is liable under § 550(a) of the Bankruptcy Code. Enron also seeks subordination, pursuant to § 510 of the Bankruptcy Code, of an equity-related claim asserted by Credit Suisse and disallowance, pursuant to § 502(b) of the Bankruptcy Code, of the equity-related claim as unenforceable against Enron under applicable law.

On February 20, 2004, Credit Suisse filed a motion to dismiss the adversary proceeding, pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7012(b) and Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6), for failure to state a claim. Credit Suisse contends that the "safe harbor" provisions of section 546 of the Bankruptcy Code bar the relief sought by Enron. Enron opposes the motion to dismiss, arguing that the transfer in issue is not protected by the safe harbor provisions of the Bankruptcy Code. The ISDA, the Securities Industry Association and the Bond Market Association (collectively, the "Amici") obtained permission from the Court to file and filed, as Amicus Curiae, a memorandum of law, dated April 7, 2004, in support of Credit Suisse's motion to dismiss the adversary proceeding.[1] A hearing on this matter was held before the Court on October 28, 2004.

## DISCUSSION

Fed.R.Civ.P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R. Bankr.P. 7012(b). In considering a Fed. R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Id.*

■■■ In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 106 S.Ct. 2932, 2944 92 L.Ed.2d 209 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir.2000).

---

**1.** The Amicus brief was filed, generally, in support of the position taken by Credit Suisse in this adversary proceeding and by several other defendants in various other similar adversary proceedings filed by the Debtors.

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Pursuant to Fed.R.Civ.P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.* 355 U.S. at 47–48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by Fed. R.Civ.P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

 In reviewing a Fed.R.Civ.P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; *Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Indus. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.

2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, the Court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Rule 201 of the Federal Rules of Evidence ("Fed.R.Evid."). *In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 357 (S.D.N.Y.2003), *citing, Chambers,* 282 F.3d at 153.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint.

### Procedural Issues

 Enron first argues that Credit Suisse's motion to dismiss is procedurally flawed because it introduces extrinsic material outside of the factual allegations contained in the Complaint and, therefore, cannot form the basis to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

In reviewing this Fed.R.Civ.P. 12(b)(6) motion, the Court may properly consider

the Confirmations and the agreement entered into by the parties which reflect the terms of the transaction that is the subject of the Complaint. The Confirmation describes the terms of the transaction between the parties. Enron referenced the Confirmation in the Complaint and relied upon its terms and the terms of the agreement in drafting the Complaint.

■ The Court, however, does not consider the extrinsic material referenced by Amici concerning Enron's alleged intent in entering into the transactions with Credit Suisse. To support the contention that Enron entered into the transactions with Credit Suisse as a risk management strategy to hedge its incentive-based compensation plans, the Court's attention is directed to the 10–K report filed with the SEC by Enron in which Enron reported that it had entered into certain common stock swaps, with an aggregate notional amount of $121,000,000.00, to hedge certain incentive-based compensation plans.[2] Enron disputes this contention with respect to the intent in entering into the transactions with Credit Suisse. Inasmuch as there is no way to correlate the transactions or amount mentioned in the 10–K filing with the actual transactions with Credit Suisse, the 10–K filing cannot form the basis, at this stage of the proceedings, to resolve this factual dispute.

### Section 546(e) of the Bankruptcy Code

■ In its motion to dismiss, Credit Suisse argues that as a matter of law, the transfers made by Enron to Credit Suisse are settlement payments protected from avoidance pursuant to section 546 of the

Bankruptcy Code. Section 546(e) of the Bankruptcy Code provides that

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). Section 546 of the Bankruptcy Code provides a "safe harbor" for certain types of transactions as its purpose is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 848 (10th Cir.1990) (hereinafter, "*Kaiser I*"). When first enacted, 11 U.S.C. § 546 only applied to the commodities market, however, in 1982, its scope was expanded to protect the securities market. *Kaiser I*, 913 F.2d at 848–49. In connection with the securities trade, "settlement payment" is defined in section 741(8) of the Bankruptcy Code which provides that:

> "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).[3] As section 741(8) merely lists various types of settlement

---

2. *See* 2000 Enron Corp. 10–K at F–8, Section 3 (Price Risk Management Activities and Financial Instruments) (available at http://www.sec.gov/Archives/edgar/data/1024401/000102440101500010/0001024401–01–500010. txt).

3. In the context of the forward contract market, a "settlement payment" is similarly de-

payments without specifying the required elements, its reference to "or any other similar payment commonly used in the securities trade" provides a basis upon which to get around the circularity of the definition and discern the meaning of the term "settlement payment." *See Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 538 (9th Cir. BAP 2005). Thus, to qualify as a settlement payment that is protected by the safe harbors, the settlement payment must be "commonly used" within the industry. *Enron Corp. v. Bear Stearns Int'l Ltd (In re Enron Corp.),* 323 B.R. 857, 870 (Bankr. S.D.N.Y.2005).

In *Bear Stearns Int'l,* 323 B.R. at 876, this Court held that, pursuant to Oregon law, transfers made by an Oregon corporation to acquire its own shares in violation of an Oregon statute,[4] which renders distributions[5] by a corporation on account of its stock illegal, were not settlement payments protected from avoidance by section 546 of the Bankruptcy Code. The Court's holding was based on the fact that under Oregon state law, if Enron was insolvent, Enron's repurchase of its own shares in violation of the Oregon statute would be void and therefore a nullity. *Field v. Haupert,* 58 Or.App. 117, 647 P.2d 952, 953–54 (1982); *see also Minnelusa Co. v. Andrikopoulos,* 929 P.2d 1321, 1324 (Colo. 1997) (en banc) (comparing various state court interpretations regarding whether corporate stock repurchases by an insolvent corporation are void or voidable and noting that Oregon concludes that such transactions are void). If the underlying transaction were void, there would be no securities transaction to complete from which a settlement payment to be protected could result. For the same reasons as set forth in this Court's *Bear Stearns* Opinion, the transfers that were made by

---

fined in section 101(51A) of the Bankruptcy Code as follows:

> "settlement payment" means, for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

11 U.S.C. § 101(51A).

4. Or.Rev.Stat. § 60.181, entitled Distributions to Shareholders provides, in relevant part, that

> (1) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (3) of this section.
>
> . . . .
>
> (3) A distribution may be made only if, after giving it effect, in the judgment of the board of directors:
> (a) The corporation would be able to pay its debts as they become due in the usual course of business; and

> (b) The corporation's total assets would at least equal the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Or.Rev.Stat. § 60.181.

5. Pursuant to Oregon Revised Statutes, a "distribution" is defined as

> a direct or indirect transfer of money or other property, except of a corporation's own shares, or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend, a purchase, redemption or other acquisition of shares, a distribution of indebtedness, or otherwise.

Or.Rev.Stat. § 60.001(7) (Oregon Laws Ch. 107 (S.B.398) 2005).

Enron to Credit Suisse in exchange for Enron's own shares of stock, if it were ultimately determined that Enron had been insolvent at the time, were not settlement payments that would qualify for protection under section 546 of the Bankruptcy Code.

Thus, accepting as true all of the material allegations in Enron's Complaint, section 546 of the Bankruptcy Code would not protect any transfer made in violation of Or.Rev.Stat. § 60.181 from avoidance. As Credit Suisse sought dismissal based upon the application of section 546 of the Bankruptcy Code, its motion to dismiss the adversary proceeding with respect to those transfers that were made in exchange for Enron stock is denied.

### Section 546(g) of the Bankruptcy Code

█ There are, however, other transfers from Enron to Credit Suisse that were not made in exchange for Enron stock and which would not fall within the proscription of the Oregon statute prohibiting distributions to shareholders. As previously noted, certain payments were not made in exchange for stock. Rather, they were allegedly components of cash-settled equity swaps.

Section 546(g) provides

Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer under a swap agreement, made by or to a swap participant, in connection with a swap agreement and that is made before the commencement of the case, except under section 548(a)(2)(A) of this title.

11 U.S.C. § 546(g).

Pursuant to the legislative history of section 546, the sections concerning swap agreements were added to the Bankruptcy Code for the purpose of extending the same protections to swap agreements that were afforded to forward and securities transactions. The legislative history of section 546(g) indicates that the purpose of the section is to ensure that the swap financial market remains stabilized and protected from "uncertainties regarding the treatment of [its] financial instruments under the Bankruptcy Code." H.R.Rep. No. 101–484, P.L. 101–311, *reprinted in*, 1990 U.S.C.C.A.N. 223, 1990 WL 92539 (May 14, 1990). This section was intended to extend to swap agreements the same type of protection from avoidance powers that was afforded to similar types of financial agreements, including forward, commodity and securities contracts. *Id.* Similar to the subsection concerning forward and securities contracts, section 546(g) provides, with respect to swap agreements, that a trustee may not avoid a transfer entered into prepetition except where the swap agreement is entered into with the actual intent to hinder, delay or defraud creditors. *Id.* at 223.

At the time of the transactions at issue, section 101(53B) of the Bankruptcy Code defined a swap agreement as:

(A) an agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including any option to enter into any of the foregoing);

(B) any combination of the foregoing; or

(C) a master agreement for any of the foregoing together with all supplements.

11 U.S.C. § 101(53B).[6]

In *Interbulk v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 201 (Bankr.S.D.N.Y.1999), the court described a swap agreement as

a bilateral agreement, frequently between a commercial entity involved with commodities or subject to interest rate, currency or equity price fluctuations and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination between the parties based upon changes in the price

**6.** The current version of 11 U.S.C. § 101(53B)provides that the term "swap agreement"—

(A) means—
(i) any agreement, including the terms and conditions incorporated by reference in such agreement, which is—
(I) an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap;
(II) a spot, same day-tomorrow, tomorrow-next, forward, or other foreign exchange or precious metals agreement;
(III) a currency swap, option, future, or forward agreement;
(IV) an equity index or equity swap, option, future, or forward agreement;
(V) a debt index or debt swap, option, future, or forward agreement;
(VI) a total return, credit spread or credit swap, option, future, or forward agreement;
(VII) a commodity index or a commodity swap, option, future, or forward agreement; or
(VIII) a weather swap, weather derivative, or weather option;
(ii) any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph and that—
(I) is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap markets (including terms and conditions incorporated by reference therein); and
(II) is a forward, swap, future, or option on one or more rates, currencies, commodities, equity securities, or other equity instruments, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or

measures of economic or financial risk or value;
(iii) any combination of agreements or transactions referred to in this subparagraph;
(iv) any option to enter into an agreement or transaction referred to in this subparagraph;
(v) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), or (iv), together with all supplements to any such master agreement, and without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement under this paragraph, except that the master agreement shall be considered to be a swap agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i), (ii), (iii), or (iv); or
(vi) any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in clause (i) through (v), including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and
(B) is applicable for purposes of this title only, and shall not be construed or applied so as to challenge or affect the characterization, definition, or treatment of any swap agreement under any other statute, regulation, or rule, including the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, the Securities Investor Protection Act of 1970, the Commodity Exchange Act, the Gramm–Leach–Bliley Act, and the Legal Certainty for Bank Products Act of 2000.

of the underlying asset or index as determined by an agreed-upon benchmark. *Id.* at 201.

A swap agreement has also been defined as "an agreement between two parties whereby the parties agree to exchange one or more future payments measured by different prices of a commodity, with payments calculated by reference to a notional amount." *Id.* at 201, *citing, Nuts and bolts of Financial Products 1999: Understanding the Evolving World of Capital Market and Investment Management Products,* 1099 PLI Corp 315, 323 1999. In swap agreements, the "'notional' amount provides the basis for calculating payment obligations but does not change hands." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust,* 322 F.3d 1039, 1042 (9th Cir. 2003) (defining swap agreement as "a contract between two parties ... to exchange ... cash flows at specified intervals, calculated by reference to an index ... [and basing the payments] on a number of indices including interest rates, currency rates and security or commodity prices").

█ Although the definition of "swap agreement" in section 101(53B) of the Bankruptcy Code at the time of these transactions did not refer explicitly to equity swaps or equity forwards, it did include by its plain language "any other similar agreement."[7] This extension to similar agreement was a recognition that the nature of swap agreements "evolve over time" and to encompass within the statute's protection any such evolution. *See* S.Rep. No. 101–285, 8 (1990). As a result, equity swaps and credit derivatives should include what the swap market understands to be a swap agreement.

Here, Credit Suisse argues that a certain transfer did not complete the delivery of any Enron stock. Rather, it simply provided for a payment calculated on the basis of a notional amount of Enron common stock. The Enron stock never moved as it was merely the item used to make the calculations. Credit Suisse contends that the incorporation of the ISDA Master Agreements and ISDA definitions in the confirmations at issue evidences that the participants in the equity derivatives market consider equity swaps to be swap agreements. Credit Suisse also directs the Court's attention to another enactment in 2000[8] which specifically included equity swaps in its definition of swap agreements as further evidence that equity swaps were then in general use and regarded as swap agreements. For its part, Enron contends that the financial community's continuing efforts to amend the Bankruptcy Code to specifically include equity swaps within the definition of swap agreements evidences that, at the time of these transactions, the status of an equity swap as qualifying as a section 546(g) swap agreement was not as certain as argued by Credit Suisse.[9] En-

7. As previously set forth in footnote 6, the current version of section 101(53B) specifically references "equity swaps" and "equity forwards."

8. When the Commodity Exchange Act was updated in 2000, the definition of swap agreement specifically listed equity swaps. The Commodity Futures Modernization Act of 2000, Pub.L. 106–554, Dec. 21, 2000.

9. Enron concedes that the fact that the legislation was not amended earlier specifically to include equity swaps within the definition of swap agreements is not dispositive of whether they qualified as such prior to the 2005 amendment. Rather, Enron merely cites to the trade associations' prior continuing efforts to have the definition amended and their testimony in support of those efforts as evidence that there was not consensus in the financial community concerning whether equity swaps came within the definition of swap agreements prior to the amendment. In addition, Enron contends that the trade associations' efforts also contradict Credit Suisse's conten-

ron also references what it considers characteristics of the transactions at issue that would not make them similar to the types of equity swap agreements covered by the definition in the Bankruptcy Code, including the fact that the shares at issue were one of the trading parties own shares which potentially allowed for manipulation and influence over the share price and the fact that, with respect to certain regulations, the IRS afforded disparate treatment to equity swaps involving a corporation's own shares.

Thus, Credit Suisse and Enron both present evidence to the Court to support their position concerning the similarity between the transactions at issue and the types of transactions delineated in section 546(g) of the Bankruptcy Code. In a motion to dismiss, however, a court is not called upon to weigh the evidence. To determine whether a transaction that is not specifically included in section 546(g) qualifies as "any other similar agreement," it is necessary to establish if the swap market generally understands it to be a swap agreement. As these transactions transpired prior to·the 2005 amendment to sections 546(g), evidence or authority must be presented showing that, at that time, the market considered equity swaps to be swap agreements. Thus, with respect to

the equity swap transactions in which the transfers by Enron to Credit Suisse were not made in exchange for stock, evidence must be presented on the issue of whether, at the time of the transactions, equity swaps involving a corporation's own stock were in general use and generally understood in the swap market to be swap agreements.[10]

### Section 548(a)(1)(A) of the Bankruptcy Code

 In the Complaint, Enron seeks, pursuant to section 548(a)(1)(A) and relevant state fraudulent transfer law, to avoid the 90–Day Transfers and their related 2001 agreements as intentionally fraudulent. Specifically, Enron asserts that these transfers were made "with actual intent to hinder, delay or defraud" Enron's creditors. Credit Suisse contends that the causes of action based upon intentional fraud should be dismissed as they are conclusory and have not been pled with sufficient particularity.

At the time of the commencement of this adversary proceeding, section 548(a)(1)(A) of the Bankruptcy Code,[11] provided that

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor

---

tion that equity swaps were clearly identified as "commodity contracts."

**10.** With respect to the previously discussed transfers by Enron in exchange for its stock, Credit Suisse also argued that the transfers were protected from avoidance pursuant to section 546(g) of the Bankruptcy Code as commodity swaps. The Court, however, does not agree. Where a transaction is rendered void by state law, it is a nullity. Thus, the purpose of subsection 546(g) is not implicated. The transaction is void and there is no recognized financial instrument to protect from the "uncertainties regarding [its treatment] under the Bankruptcy Code." Rather, the treatment of the financial instrument is the result of state law voiding the entire trans-

action. If it is determined that the transaction violated Oregon law, the agreement would be a nullity and have no legal effect. As a consequence, the transfer would not have been made under or in connection with a swap agreement and it would not be protected from avoidance under section 546(g) of the Bankruptcy Code.

**11.** Section 548 of the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and pursuant to its express provision, the amendments do not apply to this adversary proceeding which was commenced prior to its enactment.

that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. 548(a)(1)(A).

Fed.R.Civ.P. 9(b), which is entitled Fraud, Mistake, Condition of the Mind and which is incorporated into bankruptcy practice by Fed. R. Bankr.P. 7009, provides that

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

FED.R.CIV.P. 9(b).

■ The Fed.R.Civ.P. 9(b) requirements of pleading fraud with particularity apply to claims of intentional fraud. *Pereira v. Equitable Life Ins. Society (In re Trace Int'l Holdings, Inc.)*, 289 B.R. 548, 557 (Bankr.S.D.N.Y.2003). The particularity required by Fed.R.Civ.P. 9(b), however, must be viewed in the context of "the liberal notice-pleading requirement" of Fed.R.Civ.P. 8.[12] *In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597, 619 (N.D.Ill.1987).

■ Pursuant to the express terms of Fed.R.Civ.P. 9(b), a party's requisite men-

tal state, or scienter, may be pleaded generally. Fed.R.Civ.P. 9(b). Nevertheless, as the purposes of Fed.R.Civ.P. 9(b) are to give fair notice to a defendant of the claim to enable it to prepare its defense, to protect the defendant's reputation and good will from ill-considered charges of misconduct, and to protect the defendant from strike suits, the relaxation of the specificity requirement for scienter is not to be viewed as permission to base fraud claims "on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (citations omitted). Rather, to further the purposes of Fed.R.Civ.P. 9(b), despite the reduced pleading standard for scienter, plaintiffs are required "to allege facts that give rise to a strong inference of fraudulent intent." *Id.*

■ As previously noted, one of the major functions of Fed.R.Civ.P. 9(b) is to give adequate notice of the claim to the adverse party to allow it to prepare its defense. As a result, fraud allegations cannot be based upon "information and belief" except in instances where the opposing party is in control of the facts or the facts are peculiarly within the knowledge of the opposing party. *In re Manhattan Investment Fund Ltd.*, 310 B.R. 500, 505 (Bankr.S.D.N.Y.2002). And when based upon information and belief, the complainant must set forth the facts upon which the belief is based. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

---

12. Fed.R.Civ.P. 8, incorporated into bankruptcy practice by Fed. R. Bankr.P. 7008 provides, in relevant part, as follows:

(a) Claims for Relief. A pleading which sets forth a claim for relief ... shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief ....

(e) Pleading to be Concise and Direct; Consistency.

(1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.

■ Courts take a liberal approach when reviewing allegations of fraud pled by a trustee because, as an outside party to the transactions in issue, the trustee must plead the claim of fraud for the benefit of the estate and its creditors based upon second-hand knowledge. *Manhattan Investment,* 310 B.R. at 505.

■ Further, because establishing a transferor's actual intent is ordinarily not susceptible to direct proof, courts look to the totality of the circumstances and certain "badges of fraud." *Manhattan Investment,* 310 B.R. at 505. "Badges of fraud are circumstances that ... commonly accompany fraudulent transfers [and] their presence [leads to] and inference of intent to defraud." *Manhattan Investment,* 310 B.R. at 505 n. 3. Certain examples of badges of fraud that courts have relied upon to infer the requisite intent include

1) a close relationship among parties to the transaction;

2) a secret or hasty transfer not in the usual course of business;

3) the inadequacy of the consideration;

4) the transferor's knowledge of other creditor's claims and the debtor's inability to pay them;

5) use of dummies or fictitious parties; and

6) retention of control or reservation of rights in the transferred property by the transferor after the conveyance.

*Id.* A court may infer the requisite intent based upon a confluence of these factors. Thus, circumstantial evidence is utilized to prove actual fraudulent intent. Further, as section 548(a)(1)(A) refers to "hinder, delay or defraud" in the disjunctive, intending any of these results is sufficient to render a transfer fraudulent.

Enron alleges that transfers were made "with actual intent to hinder, delay or defraud" Enron's creditors. Credit Suisse contends that, as plead, the fraud claims are conclusory and have not been pled with the requisite particularity. Enron counters that a relaxed standard or pleading applies because Enron does not have access to the parties that have first-hand knowledge and therefore is in the same position as a trustee.

■ Ordinarily a debtor in possession is presumed to have first-hand knowledge of the facts. However, in the instant case, the personnel with first-hand knowledge of the relevant facts left the company early on and, certainly, senior management left during that period as well. Moreover, various investigations by governmental and quasi-governmental agencies have made many of the relevant decision-makers unavailable to Enron resulting in Enron being in the same position as a trustee with second-hand information. Furthermore, early in the case, a restructuring officer took on the role of interim CEO. In that role, he performed certain functions based on second-hand information, as would a trustee. As previously noted, the basis for taking a more liberal approach in reviewing a trustee's pleadings of actual fraud is predicated on the trustee's second-hand knowledge. Therefore, if a debtor in possession operates under the same disadvantage, a similar standard should apply. In this case, the debtor in possession's deficiencies with respect to first-hand knowledge are sufficient to justify a relaxed pleading requirement In any event, even applying a stricter standard to the facts as alleged, the complaint is viable.

Here, Enron alleges that while it was insolvent and without the wherewithal to make cash payments to creditors, it made payments in violation of Oregon corporate law to Credit Suisse. Enron further alleges that Credit Suisse had leverage and was a sophisticated lender with knowledge of

Enron's precarious financial position that was not available to smaller creditors of Enron. Enron alleges the lack of fair consideration for the 90–Day Transfers. Enron further alleges that the payments to Credit Suisse depleted Enron's cash and adversely impacted its liquidity and hindered or delayed payment to Enron's other creditors. Enron references Credit Suisse's agreement, as set forth in the Confirmations, to be treated with the status of a shareholder in the event of Enron's bankruptcy. However, Enron asserts that as bankruptcy approached, Credit Suisse maneuvered to affect this status and evade this contractual term, elevating Credit Suisse's subordinate rights and hindering other creditors. Enron contends that Enron wrongfully transferred assets to Credit Suisse, a powerful shareholder, to the disadvantage of creditors and there was intent to hinder or delay such creditors. The Court concludes that the badges of fraud that Enron alleges are sufficient to defeat a motion to dismiss. In addition, because it has a well-pleaded complaint, Enron is entitled to take discovery.

### Additional Contentions

 Credit Suisse argues that certain of the transfers relate to transactions that were entered into more than one year prior to the date Enron filed its bankruptcy petition and, therefore, are not avoidable pursuant to section 548 of the Bankruptcy Code. Enron, however, disputes this contention and Enron argues, *inter alia*, that in the Complaint it alleged that at various times the parties entered into new agreements that changed the terms of the transactions. Enron also alleged that the parties entered into ten separate, individual transactions within the one-year period prior to Enron filing its bankruptcy petition. As the allegations in the Complaint must be accepted as true at this stage of the proceedings, there is a factual dispute and dismissal of these causes of action is not warranted.

As a result of the Court's determination to deny the motion to dismiss in relation to the previously discussed causes of action, the Court also denies the motion to dismiss those causes of action seeking disallowance or subordination of other claims that Credit Suisse may have against Enron. The viability of the disallowance causes of action depend upon the resolution of the previously discussed causes of action. With respect to the subordination causes of action, there are disputes with respect the agreements and to Credit Suisse's status as a shareholder which if determined in favor of Enron would allow it to prevail.

Credit Suisse had also requested that, in the event of the denial of its motion to dismiss, this adversary proceeding be consolidated with an adversary proceeding commenced by Enron against various financial institutions to which, by amendment, Credit Suisse has been added as a defendant. Credit Suisse argues that consolidation is warranted as the actions involve common questions of law or fact and to avoid additional costs and delay. Credit Suisse's primary argument in support of consolidation concerned duplicative discovery. Recent developments involving various Enron-related adversary proceedings, including the entry of an order directing consolidated discovery in those adversary proceedings with common questions of law or fact, may have adequately addressed Credit Suisse's concern. In any event, any remaining issue concerning the request for consolidation will be addressed by the Court at a pre-trial conference to be scheduled in this adversary proceeding.

### Conclusion

The Court concludes that with respect to any transaction where Enron paid Credit Suisse in exchange for its own shares of

stock, if the payment to Credit Suisse is determined to be a violation of Or.Rev. Stat. § 60.181, the transaction by Enron to acquire its own shares was void under Oregon state law. If rendered void and a nullity, there was no securities transaction to complete and no settlement payment could result. Therefore, the payment could not be considered a settlement payment that qualifies for protection from avoidance under section 546(e) of the Bankruptcy Code.

Further, as a null and void transaction, Credit Suisse could not avail itself of the protection from avoidance provided for transfers in connection with swap agreements pursuant to section 546(g) of the Bankruptcy Code.

With respect to the transfers that did not complete the delivery of any Enron shares but simply provided for a payment calculated on the basis of a notional amount of Enron common stock, a hearing is required to determine whether at the time of these transactions, the swap market considered these equity swaps in a company's own stock to be swap agreements similar to the types of swap agreements set forth in section 546 of the Bankruptcy Code.

Accepting as true all of the material allegations in Enron's Complaint, section 546 of the Bankruptcy Code would not protect the transfers made in violation of Or.Rev.Stat. § 60.181 from avoidance. Further, a hearing is required to determine whether, at the time of the transactions, the swap market considered equity swaps in a company's own stock to be swap agreements. As Credit Suisse sought dismissal based upon the application of section 546 of the Bankruptcy Code, its motion to dismiss the adversary proceeding in that respect is denied.

Further, Enron has sufficiently pled the Complaint to defeat Credit Suisse's motion to dismiss for failure to plead the fraud claim with particularity.

Based upon the foregoing, Credit Suisse's motion to dismiss the Complaint is properly denied.

Counsel for the Debtors is to settle an order consistent with this Court's Opinion.